UNITED STATES of America, Appellee,

v.

James R. GEORGE, Appellant.

No. 92–2827.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 13, 1993.

Decided Feb. 19, 1993.

Rehearing and Rehearing En Banc Denied May 10, 1993.

Before MORRIS SHEPPARD ARNOLD, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and THOMAS M. REAVLEY,* Senior Circuit Judge.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

James R. George appeals from convictions on twelve counts of bank fraud in violation of 18 U.S.C. § 1344. He was sentenced to 33 months imprisonment and ordered to pay restitution in an amount exceeding $4 million. For reversal, George argues that the district court[1] erred in (1) permitting jurors to submit written questions to be asked of witnesses by the court during the trial; (2) calculating the amount of monetary loss pursuant to § 2F1.1 of the Federal Sentencing Guidelines; and (3) overruling George's motion to dismiss counts one through twelve on the ground of multiplicity. For the reasons set forth in this opinion, we affirm.

## I.

James R. George was vice-president of the now bankrupt B & G Leasing, Inc. ("B & G"), which he co-owned with his brother, who was president. The two brothers subsequently formed another company, Nexus, which did business as Dollar Rent–A–Car ("Dollar"). B & G began purchasing wholesale automobiles and leasing to Dollar. The cars were ultimately sold at a local wholesale auto auction.

B & G acquired financing for its operation from several local banks, establishing a line of credit with each bank by pledging the automobiles it bought as collateral. B & G then purchased the automobiles from car dealers on a "float," which allowed it to pay for the cars thirty days after purchase. The banks agreed to the loans by requiring B & G to submit documentation for each car, including the automobile dealer invoice. A bank would then credit B & G's account at that bank with an amount equal to the invoice price plus $75 to cover licensing fees and other incidental expenses.

Charles E. Atwell, Kansas City, MO, argued (Jacqueline A. Cook, on the brief), for appellant.

Matt J. Whitworth, Asst. U.S. Atty., Kansas City, MO, argued (Lajuana M. Counts, Asst. U.S. Atty., on the brief), for appellee.

* The HONORABLE THOMAS M. REAVLEY, Senior Circuit Judge for the Fifth Circuit, sitting by designation.

1. The Honorable D. Brook Bartlett, District Judge, United States District Court for the Western District of Missouri.

Prior to 1986, factory invoices included, as a matter of standard practice, a "dealer holdback" amount (a percentage of the total invoice), and did not include fleet incentive. When manufacturers began to invoice fleet purchases differently, the invoiced amount of the vehicle was reflected as being lower; thus, the amount B & G could borrow from the banks was reduced. At that time, appellant George instructed an employee to alter the invoices before they were submitted to the banks. At George's instruction, she began physically cutting off the actual figures to be paid by B & G to the automobile dealerships for cars and inflating the invoice amounts. The banks, therefore, would lend B & G those inflated amounts. Employees testified that there were thousands of invoices altered through the years, as B & G was purchasing as many as 400 to 500 cars per month before it collapsed.

Eventually, one of the banks involved notified the Georges that they would have to move their account from the bank, as the bank was receiving an increasing number of overdrafts. Although appellant George received advance notice of the date that checks would be returned for insufficient funds, the B & G account was not moved. When B & G failed shortly thereafter, that bank suffered losses of more than $2.9 million. In total, seven banks suffered from fraudulently altered dealer invoices when B & G failed.

## II.

■ George claims that the district court erred in permitting jurors to ask questions of the witnesses during the course of the trial in violation of his Fifth, Sixth, and Fourteenth Amendment rights to due process, a fair and impartial jury, and effective representation. He argues that the practice of juror questioning distorts the posture of jury from that of an impartial observer into that of an adversary. He suggests that such a role is in direct conflict with the standard instruction to the jury that it is to form no opinions until all evidence has been presented. George argues that the jurors' altered status from

factfinder to advocate was evident in the tenor of many of the approximately 65 written questions submitted to the court. In addition, George argues that such questioning deprived him of effective representation because there was no opportunity to prepare for cross-examination using the discovery techniques usually available in trial proceedings. He also notes that he was instructed to leave the courtroom while counsel debated the appropriateness of juror questions.

George calls our attention to *United States v. Johnson*, 892 F.2d 707 (8th Cir. 1989), in which this court discussed the propriety of jurors asking questions of witnesses. George correctly notes that this court has warned against the risks of juror questioning and the importance of maintaining the jury's role as neutral factfinder. *See e.g.*, *Johnson* at 713–15; *United States v. Welliver*, 976 F.2d 1148, 1154–55 (8th Cir.1992). George acknowledges, however, as he must, that we have held that the practice of allowing juror questions is a matter committed to the sound discretion of the district court and is not prejudicial *per se*. *United States v. Gray*, 897 F.2d 1428, 1429–30 (8th Cir.1990). In the present case, the jury submitted questions in writing to the court to be discussed with the attorneys and ruled upon by the trial judge. The jury was instructed on the questioning procedure used by the court and was told that it should not draw any factual conclusions from what it observed because it was the judge's job to determine which questions were proper. The questions were debated by counsel outside the hearing of the jury, and any question found by the court to be objectionable under the rules of evidence was rejected. The court did not allow the defendant to participate in the discussion because he would not have been included in the conference if it had occurred at the bench. Although defense counsel told the court that juror questioning put him in the position of offending the jury by objecting to its questions, the court responded that there had been only one or two of 20 questions that could have given such an appearance. He further stated

that the jury was accustomed to seeing the parties at bench conference.

Mr. George relies heavily upon *DeBenedetto v. Goodyear Tire & Rubber Co.,* 754 F.2d 512 (4th Cir.1985), which contains a pointed discussion of the dangers of allowing jurors to question witnesses. But the questioning procedure employed in *DeBenedetto* differed significantly from that employed in the present case because, in *De-Benedetto,* jurors were allowed to direct questions orally to the bench after each witness testified, and, if the court deemed the question proper, the witness was then instructed to answer it. This court has noted some of the dangers inherent in allowing jurors to raise questions within the hearing of other jurors, *see e.g., United States v. Land,* 877 F.2d 17, 19 (8th Cir.), *cert. denied,* 493 U.S. 894, 110 S.Ct. 243, 107 L.Ed.2d 194 (1989), but has maintained its standard that prejudice must be determined according to the facts of each case. Unlike *DeBenedetto,* moreover, in the present case neither the defendant nor his counsel was placed in a direct adversarial role with respect to the jury. The procedures of the trial court were more formal than those in *DeBenedetto,* and we believe that they effectively insulated the jury from the parties. It is significant, too, that the court in *DeBenedetto,* while noting the perils inherent in juror questioning, nevertheless found that there had been no prejudice to the parties. While we continue to recognize the risks involved in these kinds of practices, we cannot say that the district court committed error in employing the procedure that it used.

### III.

■ George contends that the district court erred in calculating the total loss for sentencing purposes because it did not consider evidence that the banks recovered a substantial portion of the money included in the calculation. George argues that he cooperated in returning collateral and liqui-

dating cars that had been purchased by B & G, thereby returning to the banks approximately 83% of the amounts lent on the cars.

Relying upon its finding that the banks would have stopped doing business with George if they had known they were lending money in amounts greater than the actual invoices, the court found that the total amount of loss to the banks was $4,325,137.[2] The court found that the banks were "unwilling, unknowing and uninformed participants in the operation of B & G" and were drawn further and further into the business by the owners' fraud.

The government asserts, and we agree, that the issue of the amount of loss is a factual question which will not be overturned unless it is clearly erroneous. As the district court noted at George's sentencing, § 2F1.1 U.S.S.G. states that the amount of loss relevant to sentencing purposes is either the amount of loss that the defendant intended to inflict or the actual loss resulting from the fraudulent conduct, whichever is greater. *See also United States v. Prendergast,* 979 F.2d 1289 (8th Cir.1992). We have read the entire sentencing transcript with care and have discovered no findings that are clearly erroneous. We therefore find no reason to disturb the findings of the trial court on this issue.

### IV.

■ For his last issue on appeal, George argues that the district court erred by denying his motion to dismiss counts one through twelve on the ground of multiplicity, that is, the charging of a single offense in several counts. The language of 18 U.S.C. § 1344, the bank fraud statute under which George was charged, clearly states that each execution of the scheme to defraud may be charged as a separate act. Each of the invoices was altered separately, involved a separate automobile, and oc-

---

**2.** While appellant George's brief states that the district court's total calculation was $6,325,-001.78 (p.25), and the appellee's brief states the court's calculation to be $4,325,001 (p.15), we have adopted the loss amount, as stated by the court, in the Sentencing Transcript—$4,325,137 (pp.173–174).

curred on a separate date. We therefore do not find George's argument persuasive.

## V.

For the reasons outlined above, the court below is hereby affirmed in all respects.