UNITED STATES of America,
Plaintiff–Appellee,

v.

Rocky Ernesto BASCOPE–ZURITA,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Jorge Enrique ZURITA–FRANCO, also
known as Coco, Defendant–
Appellant.

Nos. 94–3948, 94–3950.

United States Court of Appeals,
Eighth Circuit.

Submitted May 17, 1995.

Decided Oct. 13, 1995.

Larry Pace, Kansas City, MO, argued, for Rocky Bascope–Zurita.

Cenobio Lozano, Jr., Harrisonville, MO, argued, for Jorge Zurita–Franco.

Mark A. Miller, Asst.U.S.Atty., Kansas City, MO, argued, for U.S.

Before McMILLIAN, BEAM, and HANSEN, Circuit Judges.

HANSEN, Circuit Judge.

Rocky Ernesto Bascope–Zurita and Jorge Enrique Zurita–Franco appeal from the final judgments entered by the district court[1] after they were found guilty of several drug offenses. They contend that the evidence is insufficient to sustain their convictions and that the district court erred by refusing to submit an instruction on venue. In addition, Bascope–Zurita argues that the district court erred by allowing jurors to ask questions during trial, and Zurita–Franco contends that the court erred in denying his challenge for cause of a venireperson. We affirm.

## I.

In the spring of 1991, the Drug Enforcement Agency (DEA) learned that Maynard Gilbert had been obtaining large quantities of cocaine from Bolivia since the 1980s and transporting it for distribution to Kansas City and countries in Western Europe. Gilbert's source of cocaine in Bolivia was a Bolivian national named Olavo Subieta–Sierra (Subieta). To conceal the cocaine from authorities, Gilbert implemented the latest technology in the drug trade, which included suspending cocaine in shampoo and cosmetics, soaking leather items with cocaine, and having the cocaine bonded or molded to or within plastic or fiberglass mediums.

One of Gilbert's confidants was Richard Dye. Dye assisted Gilbert in the drug trafficking scheme by traveling to Bolivia to acquire and bring the cocaine back to Kansas City and by allowing Gilbert to use his Blue Springs, Missouri, home as a conversion lab to reclaim the cocaine from the medium. In July 1992, Dye decided to cooperate with the government and became a paid confidential informant. Dye's cooperation with authorities led to Gilbert's arrest in Germany on or about September 22, 1992, where Gilbert was later prosecuted and imprisoned for drug trafficking.

In November 1992, after Gilbert's arrest, Subieta negotiated with Dye for the sale of a cocaine-laden suitcase. Dye later traveled to Santa Cruz, Bolivia, acquired the suitcase, and discussed with Subieta the possibility of using other mediums to transport cocaine. DEA Special Agent Larry Tongate accompanied Dye on this trip, and Dye introduced Agent Tongate to Subieta as his partner. Subieta indicated that additional mediums made of plastic and leather were available in which to smuggle cocaine. During a subsequent transaction between Subieta, Dye, and Agent Tongate, Agent Tongate asked Subieta whether he could arrange for cocaine to be smuggled in hot tubs. Subieta responded affirmatively and agreed to broker a deal by locating someone who would manufacture the cocaine-laden hot tub and take care of the logistics in the transaction.

In March 1993, Dye again traveled to Santa Cruz, where a Subieta associate introduced Subieta and Dye to the defendants, Bascope–Zurita and Zurita–Franco, and stated that they were proficient in the process of bonding or molding cocaine into fiberglass and plastic products. After some discussion and negotiation between the parties, the defendants agreed to manufacture a cocaine-infused hot tub. Zurita–Franco, Subieta, and Dye went to a hot tub store and selected the hot tub that was to be reconstructed with cocaine. With the assistance of one Cesar Andia, a prominent figure in the Bolivian cocaine trade and frequent supplier to Subieta, Subieta procured and delivered to the defendants ten kilograms of cocaine base that were to be infused into the tub.

After Dye returned to Kansas City, Bascope–Zurita spoke with him by telephone about the progress being made on the hot tub along with the possibility of additional cocaine transactions. In May 1993, Dye and Agent Tongate returned to Santa Cruz to pick up and pay for the completed hot tub. Dye informed Subieta that he would not pay for the hot tub without first inspecting it. Subieta contacted Zurita–Franco to make the necessary arrangements and subsequently

1. The Honorable D. Brook Bartlett, United States District Judge for the Western District of Missouri.

took Dye to see the tub. Zurita–Franco displayed the completed hot tub to Dye and Subieta at a local residence while Bascope–Zurita looked on. At some point, Subieta informed Dye that he had paid the defendants a $3,500 advance from funds that Agent Tongate had wired to Subieta.

The next day Dye and Agent Tongate met the defendants at a prearranged location to transfer the tub. The defendants took the completed tub out of their vehicle and placed it in the pickup truck that Dye and Agent Tongate were driving. Subieta arrived during the transfer, and Agent Tongate paid him the balance due on the hot tub. Subieta in turn paid the defendants their share for reconstructing the hot tub with cocaine base. After returning to the United States, Dye continued to maintain contact with Bascope–Zurita and had further discussions concerning constructing more cocaine-laden hot tubs as well as fusing cocaine into the fiberglass tops of automobiles. Dye also maintained contact with Subieta concerning future transportation of cocaine from Bolivia to Subieta's European clients. Subieta agreed to provide a cocaine-infused suitcase that was to be made by the defendants, but negotiations between Subieta and the defendants faltered and Subieta eventually obtained the suitcase from Cesar Andia.

The defendants were later arrested in Frankfurt, Germany, extradited, and returned to Kansas City, Missouri, for trial. They were subsequently charged, along with several other persons, in a multicount indictment with conspiracy to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. §§ 841 and 846 (count I); conspiracy to import into the United States in excess of five kilograms of cocaine in violation of 21 U.S.C. §§ 952, 960, and 963 (count II); and aiding and abetting in the attempt to import into the United States in excess of five kilograms of cocaine in violation of 21 U.S.C. §§ 952, 960, and 18 U.S.C. § 2 (count V). A jury found the defendants guilty on all three counts. The district court sentenced both defendants at the bottom of the identified Sentencing Guideline range to concurrent terms of 188 months (each defendant = Level 36, Criminal History Category I, resulting

in a range of 188 to 235 months). The defendants appeal.

## II.

### A.

■ The defendants challenge the sufficiency of the evidence to sustain their convictions. In evaluating these claims, "[w]e consider the evidence in the light most favorable to the guilty verdict, giving the government the benefit of all reasonable inferences that might be drawn from the evidence." *United States v. Smith,* 32 F.3d 1291, 1292 (8th Cir.1994). "We reverse only if we conclude that a reasonable fact-finder must have entertained a reasonable doubt about the government's proof of one of the offense's essential elements." *United States v. Ivey,* 915 F.2d 380, 383 (8th Cir.1990) (citation omitted).

■ Bascope–Zurita and Zurita–Franco were convicted of two conspiracy offenses and one aiding and abetting offense. With respect to the conspiracy counts, the government was required to present evidence that the defendants "entered into an agreement with one or more other persons to violate the law." *Smith,* 32 F.3d at 1293. This agreement need not be formalized but can be shown through " 'a tacit understanding proven wholly by circumstantial evidence or by inferences' " drawn from the defendant's actions. *Id.* (quoting *United States v. Searing,* 984 F.2d 960, 964 (8th Cir.1993)).

■ Zurita–Franco admits that he manufactured the cocaine-laden hot tub and that a conspiracy to distribute cocaine and import cocaine into the United States existed involving Gilbert and Subieta, among others, which he refers to as the "Gilbert conspiracy." However, he contends that his production of the hot tub was not an act done in furtherance of the objectives of the Gilbert conspiracy because the only person from that conspiracy with whom he had contact was Subieta, and Subieta's role in the hot tub transaction was limited merely to serving as a broker and translator. He observes that we have held that it is possible to have two different conspiracies to commit the same type of crime and asserts that his conduct in

this case at most supports offenses that were not charged in the indictment.

■■■ However, once a conspiracy was established (and Zurita–Franco readily concedes that the charged conspiracy existed but insists that he was not a member of it), only slight additional evidence was needed to link Zurita–Franco to it. *United States v. Logan*, 49 F.3d 352, 360 (8th Cir.1995). One does not have to have contact with all of the other members of a conspiracy to be held accountable as a conspirator. *United States v. Hernandez*, 986 F.2d 234, 236 (8th Cir. 1993). A single conspiracy may be found when the defendants share a common overall goal and the same method is used to achieve that goal, even if the actors are not always the same. *Cf. United States v. Holt*, 969 F.2d 685, 687 (8th Cir.1992) (finding one conspiracy where defendants had same overall goal and same infrastructure existed for defendants' distribution activities). We apply a variety of factors under a "totality of the circumstances" test in determining whether single or multiple conspiracies exist, including the nature of the activities involved, the location where the alleged events of the conspiracy took place, the identity of the conspirators involved, and the time frame in which the acts occurred. *United States v. Petty*, 62 F.3d 265, 267 (8th Cir.1995).

In this case, the government offered more than ample evidence to link Zurita–Franco to the charged conspiracy. The purpose of Zurita–Franco's actions was identical to those of the charged conspiracy—to smuggle goods laced with cocaine from Bolivia into other countries, including the United States (and specifically, the Kansas City area). The location where the events underlying the conspiracy took place was identical as well: Cocaine was integrated into various mediums in Santa Cruz, Bolivia, and transported to foreign countries, including the United States, for distribution. Subieta played the same organizing role as he otherwise did by serving as a contact in Bolivia, locating individuals capable of processing cocaine into the desired medium, assisting in the acquisition of the cocaine, and relaying communications and delivering funds between the parties. Additionally, Cesar Andia assisted in acquiring the cocaine to be infused into the tub, which was a role he frequently served.

Finally, we reject Zurita–Franco's contention that the charged conspiracy ceased to exist upon Gilbert's arrest in September 1992. A careful review of the record indicates that the illegal activities of the conspiracy members continued uninterrupted after Gilbert's arrest. Thus, under the totality of the circumstances and viewing the evidence in the light most favorable to the verdict, a reasonable juror could find that the charged conspiracy to distribute cocaine existed and Zurita–Franco's production of the cocaine hot tub was an act that was part of the charged conspiracy. For these reasons, we therefore reject Zurita–Franco's claim that the evidence was insufficient to sustain his conspiracy convictions.[2]

■■■ Bascope–Zurita contends that the evidence is insufficient to sustain his conspiracy convictions because the government presented no evidence that he knew of any agreement to achieve an illegal purpose or that he knowingly joined in that agreement. He contends that the only evidence the government presented against him was that: (1) he talked with Dye on the telephone several times, and (2) he assisted his uncle, Zurita–Franco, and government agents in loading the hot tub into the truck. Bascope–Zurita argues that this evidence is insufficient to sustain his conspiracy convictions as there is nothing in the record to indicate that controlled substances were discussed during his phone calls with Dye or that he was aware that the hot tub contained cocaine.

However, the government offered significant additional evidence which Bascope–Zurita omits that, when coupled with the above evidence, is sufficient to sustain Bascope–Zurita's conspiracy convictions. Bascope–

**2.** We likewise reject Zurita–Franco's argument that under *United States v. Moss*, 591 F.2d 428, 434 n. 8 (8th Cir.1979), his conspiracy convictions must be reversed because the only individuals with whom he agreed to violate the law were government agents. The evidence makes clear that at a minimum Zurita–Franco entered into an agreement with Subieta and Bascope–Zurita to violate the narcotics laws of the United States.

Zurita was present when Zurita–Franco reached an agreement with Dye and Agent Tongate to build the hot tub containing cocaine and when Subieta delivered the ten kilograms of cocaine that were to be infused into the hot tub. Bascope–Zurita informed Dye during a telephone call that complications had slowed the progress on reconstructing the hot tub with cocaine. Subieta paid Bascope–Zurita a sum of money for assisting in making and delivering the reconstructed tub. Bascope–Zurita made clear in conversations with Dye and Agent Tongate that he assisted Zurita–Franco in reconstructing the cocaine hot tub. Finally, Bascope–Zurita repeatedly attempted to enter into transactions with Dye concerning bulk amounts of cocaine and various mediums containing cocaine. Thus, we find the evidence against Bascope–Zurita sufficient to sustain his conspiracy convictions.

Although each defendant states in the heading of his brief that he is challenging the sufficiency of the evidence for the conviction for aiding and abetting in the attempt to import cocaine into the United States, neither defendant developed any argument on this issue in the body of his brief to support this claim. We therefore deem this argument waived. *See United States v. Evans,* 51 F.3d 764, 765 n. 2 (8th Cir.1995). · In any event, after a careful review of the record, we find the evidence against the defendants with respect to this count was overwhelming based upon much of the evidence recounted above.

The district court properly denied the defendants' motions for judgments of acquittal.

B.

▮ The defendants argue that the district court erred by declining to submit Eighth Circuit Model Criminal Jury Instruction 3.13,[3] which relates to venue, to the jury. They argue that venue was a disputed factual

issue in the case, and the court's failure to give this instruction to the jury constituted reversible error. The experienced district judge declined to give this instruction because the court ruled that the government had established that venue was proper in the Western District of Missouri as a matter of law, and further, the instruction was not a proper statement of the law for the purposes of this case. We review a district court's determination on whether to submit a particular jury instruction for an abuse of discretion. *United States v. Rockelman,* 49 F.3d 418, 423 (8th Cir.1995).

▮ "Proper venue is required by Article III, § 2 of the United States Constitution and by the sixth amendment, as well as Rule 18 of the Federal Rules of Criminal Procedure." *United States v. Moeckly,* 769 F.2d 453, 460 (8th Cir.1985), *cert. denied,* 476 U.S. 1104, 106 S.Ct. 1947, 90 L.Ed.2d 357 (1986). The government bears the burden of proving venue by a preponderance of the evidence. *United States v. Delgado,* 914 F.2d 1062, 1064 (8th Cir.1990). "Venue is ordinarily a question of fact for the jury to decide." *United States v. Redfearn,* 906 F.2d 352, 354 (8th Cir.1990). However, when the relevant facts to determining venue are not disputed, the district court may resolve the issue as a matter of law. *Id.* Finally, when the evidence clearly shows that the events underlying a charged offense occurred in a particular jurisdiction, the failure to give the jury a venue instruction may be harmless error. *Moeckly,* 769 F.2d at 461–62.

As noted above, the defendants were convicted on two conspiracy counts. We have held that venue is proper in a conspiracy case " 'in any jurisdiction in which an overt act in furtherance of the conspiracy was committed by any of the conspirators.' " *United States v. Bonadonna,* 775 F.2d 949, 955 (8th Cir.1985) (quoting *United States v. Overshon,*

---

3. This instruction provides as follows:
 , The Government must prove by the [ (greater weight) (preponderance) ] of the evidence that the offense charged was begun, continued or completed in the (insert district) District of (insert State).
  To prove something by the [ (greater weight) or (preponderance) ] of the evidence is to

prove that it is more likely true than not true. This is a lesser standard than proof beyond a reasonable doubt. The requirement of proof beyond a reasonable doubt applied to all other issues in the case [except insanity].
Eighth Circuit Model Criminal Jury Instruction 3.13 (1994 Edition).

494 F.2d 894, 900 (8th Cir.), *cert. denied,* 419 U.S. 853 and 419 U.S. 878, 95 S.Ct. 142 and 95 S.Ct. 96, 42 L.Ed.2d 118 and 42 L.Ed.2d 85 (1974)); *see also United States v. Stewart,* 878 F.2d 256, 258 (8th Cir.1989) (venue proper in conspiracy case in jurisdiction where overt acts took place); *Moeckly,* 769 F.2d at 460 (same). In this case, the government presented substantial and uncontroverted evidence that numerous overt acts of the conspiracy occurred in the Western District of Missouri. For instance, Bascope–Zurita spoke with Dye several times on the telephone while Dye was in Kansas City concerning the progress being made on reconstructing the hot tub, along with discussing future cocaine transactions involving different mediums. *See Stewart,* 878 F.2d at 258 (phone calls from member of conspiracy to undercover officer constitute overt acts in furtherance of conspiracy). Further, it is uncontradicted that other individuals involved in this same conspiracy, including Gilbert and one Joe Lasker, undertook various acts in furtherance of the conspiracy in the Western District of Missouri, including possessing and distributing cocaine, arranging cocaine transactions over the telephone, and reclaiming the melded cocaine from the various mediums in which it had been smuggled into this country.

The defendants were also convicted under Count V of the indictment of aiding and abetting in the attempt to import into the United States in excess of five kilograms of cocaine. 18 U.S.C. § 3238 states that "[t]he trial of all offenses begun or committed ... out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought...." Any aiding and abetting committed by these defendants, by its very nature, had to be commenced outside of the borders of the United States (and by extension outside of any particular district). The government presented uncontroverted evidence that both defendants were brought to Kansas City immediately after their arrest in Germany.

Neither defendant presented any evidence at trial that created a factual dispute on whether venue was proper in the Western District of Missouri. On appeal, they simply make the bare assertion that venue was a disputed issue in this case, and thus the district court erred in refusing to submit Eighth Circuit Model Criminal Jury Instruction 3.13. The record makes clear that the relevant events to determining venue were not in dispute in this case. Although we remain of the view that it is the better practice for district courts to submit an instruction on venue when the defendant disputes that issue, in the context of this case, the district court properly resolved this issue as a matter of law and any error by the district court in failing to submit to the jury Eighth Circuit Model Criminal Jury Instruction 3.13 is harmless.

### C.

Zurita–Franco challenges the district court's refusal to strike a venireperson for cause. We review a district court's denial of a challenge to a venireperson for an abuse of discretion. *United States v. Nazarenus,* 983 F.2d 1480, 1484 (8th Cir.1993). "To challenge for cause, a party must show 'actual partiality growing out of the nature and circumstances of [the] particular case[ ].' " *United States v. Tibesar,* 894 F.2d 317, 319 (8th Cir.) (quoting *United States v. Wood,* 299 U.S. 123, 57 S.Ct. 177, 81 L.Ed. 78 (1936)), *cert. denied,* 498 U.S. 825, 111 S.Ct. 79, 112 L.Ed.2d 52 (1990).

Zurita–Franco contends that the challenged venireperson was biased against Bolivians and offers as support for this argument statements that the venireperson made during individual questioning in the district judge's chambers. The venireperson recounted an incident in a local bar in which he had witnessed two Bolivians displaying large sums of money that the venireperson believed had been derived from drug dealing. Zurita–Franco contends that these statements illustrate that the venireperson believed that Bolivians with large sums of money are drug traffickers. Zurita–Franco also argues that the venireperson indicated that he could not be sure whether Bascope–Zurita and Zurita–Franco were the two Bolivians he had seen at the bar that evening. Zurita–Franco claims prejudice because he exhaust-

ed his peremptory challenges before reaching this venireperson, and the venireperson ultimately was impaneled and rendered a guilty verdict against him. We disagree.

A close examination of the record indicates that although the venireperson believed that the two Bolivians he observed at the bar were drug traffickers, he stated unequivocally that this opinion was based solely on his observations of those two individuals that evening and not on any belief that all Bolivians are drug dealers. He also stated that if no evidence was presented which connected the defendants to that particular incident, he could put the incident completely out of his mind and render a fair judgment based on the evidence and instructions from the court. Specifically, the venireperson stated that the only way this incident would impact his decision was if evidence were presented that the defendants had been at that particular bar with large sums of money. No evidence was presented at trial that the defendants had ever been to this particular bar, and moreover, uncontradicted evidence was presented that at the time this incident occurred the defendants were already in custody.

The district court did not abuse its discretion in declining to strike the challenged juror for cause.

### D.

Bascope–Zurita contends that the district court erred by allowing jurors to ask questions during trial. The district court used a procedure in which juror questions were submitted in writing to the court and evidentiary issues were resolved by the parties prior to the question being submitted to the witness. During the trial, the jurors submitted 32 questions to the district court, and 30 were ultimately presented to the witnesses. Bascope–Zurita contends that permitting jurors to formulate questions to be asked of witnesses transforms the inquiring juror from a neutral fact finder into an advocate for a party, thereby conflicting with the court's instructions that the jury should form no opinion on the case until all of the evidence is in.

Bascope–Zurita points out that we have observed on several occasions the perils inherent in allowing jurors to ask questions. *See United States v. George,* 986 F.2d 1176, 1179 (8th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 269, 126 L.Ed.2d 220 (1993); *United States v. Johnson,* 892 F.2d 707, 711–15 (8th Cir.1989) (Lay, C.J., concurring). However, "we have held that the practice of allowing juror questions is a matter committed to the sound discretion of the district court and is not prejudicial *per se.*" *George,* 986 F.2d at 1178. We have previously held that the procedure used by the district court in this case did not constitute an abuse of discretion. *See United States v. Stierwalt,* 16 F.3d 282, 286 (8th Cir.1994); *George,* 986 F.2d at 1178–79.

Bascope–Zurita does not contend, and we do not find, that the procedure the district court employed in this case departed from the prior directives we have previously given district courts with respect to this issue. *See George,* at 1178–79. He also does not argue, nor offer any evidence, that he was prejudiced by this procedure; he simply makes the bare assertion that it caused his trial to be unfair. Although we continue to recognize the risks involved in these kinds of practices, we cannot say that the district court in this case abused its discretion either by allowing the jurors to ask questions or in employing the procedure that it used.

### III.

For the reasons enumerated above, we affirm the judgment of the district court.