# United States Court of Appeals

### For the Eighth Circuit

_____

No. 12-1788

_____

United States of America

*Plaintiff - Appellee*

v.

Jason Gilbert, also known as J.D.

*Defendant - Appellant*

_____

No. 12-1790

_____

United States of America

*Plaintiff - Appellee*

v.

Allen Clark

*Defendant - Appellant*

_____

No. 12-1791

_____

United States of America

*Plaintiff - Appellee*

v.

Sterling Omar Platt

*Defendant - Appellant*

_____

No. 12-2009

_____

United States of America

*Plaintiff - Appellee*

v.

Antonio Torel Person, also known as Tony

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: June 11, 2013
Filed: August 6, 2013

_____

Before COLLOTON, GRUENDER, and BENTON, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Jason Gilbert, Allen Clark, Antonio Person, and Sterling Platt appeal their convictions related to a series of attempted robberies and one completed robbery of an armored car service in the Little Rock, Arkansas, area. Gilbert also appeals his sentence. We affirm.

## I. Background

In 2005, Quintus Williams worked as a driver and deliveryman for Arkansas Armored Car ("AAC"), an armored car service that transports currency and negotiable instruments on behalf of banks and other businesses. While employed by AAC, Williams asked several co-workers how they would react if robbed. Most responded that they would not resist an attempted robbery. Based on their responses, Williams concluded that it would be easy to rob an AAC truck, and he began to plan a robbery. Williams identified two suitable locations for robbing AAC: a U.S. Bank branch in North Little Rock, Arkansas, and AAC's main office in Little Rock, Arkansas.

Williams determined that the U.S. Bank branch was an attractive target because the AAC guard typically had to wait outside the bank's door holding bags of cash for fifteen to twenty minutes before being allowed inside. Additionally, AAC usually scheduled the U.S. Bank delivery during the morning, when there was little traffic on the surrounding roads. The bank also was close to the border between Little Rock and North Little Rock. Williams believed that it would be easy to flee beyond the North Little Rock Police Department's jurisdiction. The second target, AAC's main office, was attractive because Williams knew that the AAC security guard who worked the early morning shift was the oldest on AAC's staff. This guard had indicated to Williams that he was "not going to try to defend [the] money if somebody tries to take it."

Williams recruited Jason Gilbert, Mark Davis, Sterling Platt, Allen Clark, and Antonio Person to participate in the robbery. Before attempting the robbery, the

group had several meetings during which Williams shared his plans and solicited suggestions. They ultimately agreed to make their first attempt at the U.S. Bank branch. Davis and Person were assigned to arrive at the bank early and wait for the AAC truck to arrive. After the driver disembarked with the money, they planned to "push him over, grab the money, run back to the getaway car, and get back to the Little Rock side." Gilbert, a police officer, listened to his police radio during the attempt and was prepared to alert the other men if a police car was inbound. This group attempted to execute this plan at the U.S. Bank branch on at least three occasions, and for various reasons each attempt was abandoned.

After the unsuccessful attempts to rob the U.S. Bank delivery, the group planned a similar robbery at AAC's main office for September 23, 2005. The plan was to surprise and subdue the older guard as he arrived for the morning shift, use his key to unlock AAC's doors, disable the alarms, and "just get the money." Clark acted as a lookout, while Platt and Davis intended to subdue the security guard and unlock the doors. Gilbert waited in the getaway truck and listened in on his police radio. Williams and Person waited outside the building to act as back-up. This attempt failed when Davis and Platt were unable to confront the AAC guard before he got inside the building. After the failed attempt at AAC's main office, the group again attempted unsuccessfully to rob an AAC delivery at the U.S. Bank branch.

Shortly after these failed attempts, Williams moved to Dallas, Texas, in early 2006. However, Person and Gilbert stayed in contact with Williams, asking him on several occasions about "times and dates and truck numbers" and "how much money would be where." Sometime in 2006, Person recruited Oscar Holmes to assist in another robbery attempt. Person told Holmes that he "had this police person" that would listen to a police radio during the robbery "so he could alert us where the police would be" and that he was familiar with AAC's delivery schedule because he knew one of AAC's employees.

According to Holmes's testimony, he and Person cased the U.S. Bank branch for "almost a year" before they set out to attempt another robbery. In this attempt, Holmes was responsible for driving the getaway car while Person was responsible for robbing the AAC driver. Holmes and Person then intended to drive away, transfer the money to Person's car, burn the getaway car, and flee in Person's car. Person and Holmes abandoned their first attempt when a policeman drove by during the U.S. Bank delivery. After this attempt, Person flew to Dallas and returned to Arkansas with Williams's truck, which Person and Holmes planned to use during another attempted robbery at the U.S. Bank branch. Person told Holmes that he got the truck from one of his partners, who he said was a "man on the inside." During yet another robbery attempt, a police car again drove by the U.S. Bank during AAC's delivery, and Person and Holmes abandoned their planned robbery.

Person then recruited his cousin, Eric Owens, to assist with the robbery. On the morning of September 10, 2007, Owens and Person parked Person's car at the bus station where Holmes worked and walked to the North Little Rock City Hall. From city hall, they could see the AAC truck arrive at the U.S. Bank branch to make its delivery. When the AAC truck arrived, Owens and Person robbed the deliveryman at gunpoint, ran to the bus station to change clothes, emptied the cash into a duffel bag, and drove away in Person's car. Zach Moore, a friend of Gilbert's, testified that Gilbert admitted to listening to his police radio while Owens and Person robbed the AAC driver.

The next morning, Shirley Abel, a city employee who worked at North Little Rock City Hall, contacted the North Little Rock Police Department to report that she saw two men standing outside her office window immediately before the robbery. Abel told the police that the men caught her attention because one of them "kept glancing in the window. . . . And they stood out there for a fairly good amount of time, about 20, 30 minutes." Later that afternoon, police officers showed Abel a six-person photographic lineup that included a picture of Person. Abel circled Person's

photograph, indicating that the man in the photograph "looked an awful lot like the gentleman" she saw standing outside her window. Abel testified to her identification of Person at a suppression hearing and at trial.

On February 6, 2008, a federal grand jury returned an indictment charging Person, Owens, and Holmes with various offenses related to the September 10, 2007 robbery. At the time of the indictment, the Government did not know about the attempted robberies that occurred as far back as 2005. Owens and Holmes pled guilty on September 10 and 11, 2009, respectively, and both agreed to cooperate with the Government's investigation and testify at trial.

Person's trial began in February 2010 but was continued until November 2010 due to a mistrial. Before Person's retrial, the FBI interviewed Quintus Williams, who agreed to cooperate with the Government's investigation in exchange for immunity. Through Williams, the Government learned about the earlier series of attempted robberies. A grand jury subsequently returned a superseding indictment charging Gilbert, Clark, Platt, Davis, and Person with conspiring to obstruct commerce beginning in 2005. *See* 18 U.S.C. § 1951(a). The superseding indictment also charged Person with obstructing commerce, *see id.*, and brandishing a firearm during a crime of violence, *see* 18 U.S.C. § 924(c)(1)(A)(ii). Davis and Platt pled guilty and agreed to testify against the remaining defendants, who proceeded to trial.[1]

---

[1]Platt's plea was conditioned on the jury's special finding that the Government established the existence of a single conspiracy between 2005 and 2007. The district court deferred acceptance of Platt's guilty plea until after the jury returned its verdict and announced its special finding. We find this plea agreement to be unusual and question whether Federal Rule of Criminal Procedure 11 allows for such an agreement. We do not reach the issue in this case, however, because neither Platt nor the Government challenges the plea agreement.

At the close of the Government's evidence, Clark and Gilbert moved for a judgment of acquittal, arguing that the Government failed to establish the existence of a single conspiracy between 2005, when the first attempted robbery occurred, and 2007, when Person, Holmes, and Owens were arrested. The district court[2] denied their motions, concluding that the Government presented enough evidence for a reasonable jury to find that the series of attempted robberies beginning in 2005 was part of the same conspiracy as the 2007 attempted robberies and completed robbery.

A jury found Person, Clark, and Gilbert guilty on all counts. The jury also marked the special verdict form to indicate a finding "that the government ha[d] proven that there was one conspiracy to interfere with commerce spanning from 2005 to 2007." The district court sentenced each defendant to a substantial prison term, with Gilbert receiving a two-level sentencing guidelines enhancement for abusing a position of trust. *See* U.S.S.G. § 3B1.3.

Platt, Gilbert, and Clark challenge the sufficiency of the evidence, arguing that the Government failed to establish the existence of a single conspiracy. Gilbert, Clark, and Person appeal the district court's refusal to allow them to cross-examine Platt about an alleged murder involving Williams. Person appeals the denial of his motion to suppress his eyewitness identification by Shirley Abel. Finally, Gilbert appeals his sentence.

---

[2]The Honorable J. Leon Holmes, then Chief Judge, United States District Court for the Eastern District of Arkansas.

## II. Discussion

### A. Sufficiency of the Evidence – Single Conspiracy

"Whether the Government's proof at trial established only a single conspiracy or multiple conspiracies 'is determined by the totality of the circumstances, and because it is a question of fact, we draw all reasonable inferences in favor of the verdict.'" *United States v. Slagg*, 651 F.3d 832, 841 (8th Cir. 2011) (quoting *United States v. Radtke*, 415 F.3d 826, 838 (8th Cir. 2005)). "Relevant factors 'includ[e] the nature of the activities involved, the location where the alleged events of the conspiracy took place, the identity of the conspirators involved, and the time frame in which the acts occurred.'" *Radtke*, 415 F.3d at 838-39 (alteration in original) (quoting *United States v. McCarthy*, 97 F.3d 1562, 1571 (8th Cir. 1996)). "A single conspiracy may be found when the defendants share a common overall goal and the same method is used to achieve that goal, even if the actors are not always the same." *United States v. Bascope-Zurita*, 68 F.3d 1057, 1061 (8th Cir. 1995). Reversal is warranted only where no reasonable jury could have found that a single conspiracy existed. *See United States v. England*, 966 F.2d 403, 406-07 (8th Cir. 1992).

Platt, Clark, and Gilbert challenge their convictions, arguing that the Government presented insufficient evidence to establish the existence of a single conspiracy. The defendants assert that the robbery attempts led by Williams in 2005 that included Person, Platt, Clark, and Gilbert were part of a conspiracy distinct from the 2007 attempts, which involved only Person, Holmes, and Owens. Contrary to the defendants' arguments, however, "[m]ultiple groups and the performance of separate crimes or acts do not rule out the possibility that one overall conspiracy exists." *United States v. Dijan*, 37 F.3d 398, 402 (8th Cir. 1994) (quoting *United States v. Roark*, 924 F.2d 1426, 1429 (8th Cir. 1991)). Drawing all reasonable inferences in favor of the verdict, the evidence at trial established that each defendant participated in a single, ongoing conspiracy to rob an AAC delivery truck in the Little Rock area

between 2005 and 2007. Williams, who provided insider information about key aspects of AAC's operations and who in 2005 hatched the plan to rob AAC, continued his involvement through 2007, and at least two of the charged co-conspirators, Person and Gilbert, continued to pursue the robbery of an AAC truck after Williams moved to Dallas in 2006. Both Person and Gilbert contacted Williams on numerous occasions to find out when AAC made deliveries and which trucks had the most money. Holmes also testified that he and Person used Williams's truck in a failed robbery attempt in 2007. Moreover, the U.S. Bank branch was the target of both the 2007 attempts and the 2005 attempts, and the 2007 and 2005 attempts followed the same plan. During each attempted robbery, the conspirators waited for an AAC truck to arrive for a delivery, hoping to rush the driver and steal the money before he could enter his destination safely. Additionally, there is evidence that Gilbert monitored his police radio during robbery attempts in both 2005 and 2007. This evidence demonstrates that "the defendants share[d] a common overall goal and [used] the same method . . . to achieve that goal, even if the actors [were] not always the same" throughout the conspiracy. *Bascope-Zurita*, 68 F.3d at 1061.[3] A reasonable jury therefore could find the existence of a single conspiracy.[4]

## B. Cross-Examination of Platt

Gilbert, Clark, and Person also argue that the district court abused its discretion by limiting their cross-examination of Platt. "We will not reverse a district court's decision to limit cross-examination 'unless there has been a clear abuse of discretion

---

[3]Neither Platt nor Clark nor Gilbert argues on appeal that he affirmatively withdrew from the conspiracy. Any such argument is therefore waived. *See United States v. Brooks*, 175 F.3d 605, 606-07 (8th Cir. 1999).

[4]Based on our conclusion that the Government presented sufficient evidence for a reasonable jury to find the existence of a single conspiracy, we need not address the Government's argument that Platt waived his right to appeal the jury's special finding.

and a showing of prejudice to the defendant.'" *United States v. Stroud*, 673 F.3d 854, 860 (8th Cir. 2012) (quoting *United States v. Oaks*, 606 F.3d 530, 540 (8th Cir. 2010)), *cert. denied*, 568 U.S. ---, 133 S. Ct. 1581 (2013). "The Sixth Amendment guarantees the defendant 'an opportunity for effective cross-examination,' but the court 'retain[s] wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination . . . .'" *Id.* (alterations in original) (quoting *Oaks*, 606 F.3d at 539-40). "To show a Confrontation Clause violation, a defendant must show that 'a reasonable jury might have received a significantly different impression of a witness's credibility had counsel been allowed to pursue the proposed line of cross-examination.'" *Id*. (quoting *Oaks*, 606 F.3d at 540).

Gilbert, Clark, and Person each desired to question Platt regarding his knowledge of a murder that Williams allegedly committed in Dallas. The defendants argue that the alleged murder was relevant and probative because it would suggest that Platt was afraid of Williams and that Williams "engineered" Platt's testimony. The district court did not allow the defendants to cross-examine Williams about the murder because it determined that the "danger of unfair prejudice substantially outweigh[ed] the probative value" of the statements about the alleged murder. *See* Fed. R. Evid. 403.

The jury did, however, hear other evidence that substantiated Platt's fear of Williams. The court allowed the defendants to cross-examine both Williams and Platt regarding various threats Williams made to kill several accomplices to prevent them from "snitching." Platt testified that he "feared for [his] life" based on Williams's threats. Because it heard this unequivocal testimony regarding Platt's fear of Williams, the jury would not have received a "significantly different impression" of Platt's testimony if the district court had allowed the defendants to cross-examine Platt about Williams's alleged involvement in a murder. *See Stroud*, 673 F.3d at 860.

In the absence of any showing of prejudice, the district court did not commit reversible error by limiting the cross-examination of Platt.

### C.  Person's Motion to Suppress the Identification

Person also appeals the denial of his motion to suppress the eyewitness identification by Abel, arguing that the photographic lineup was impermissibly suggestive because Person was the only person in the lineup who wore a gold necklace and who also was shirtless. "When considering the admissibility of a photo lineup identification, we examine 1) whether the identification procedure is impermissibly suggestive, and 2) whether under the totality of the circumstances the suggestive procedure creates a very substantial likelihood of irreparable misidentification." *United States v. Granados*, 596 F.3d 970, 974 (8th Cir. 2010). "We review this constitutional [due process] claim de novo." *United States v. Jones*, 535 F.3d 886, 891 (8th Cir. 2008).

We conclude that the photographic lineup was not impermissibly suggestive. The lineup consisted of six photographs. Each photograph is a head shot that depicts its subject from the neck up. The six subjects have similar facial features and similar skin tones. Each is an African-American male with short hair and a small amount of facial hair on the upper lip, chin, or both. All men have similar, neutral facial expressions. The photographs are proportional in size to one another. Across all photographs, the background color and lighting is consistent. Person is depicted wearing no shirt, and the five other men all are depicted wearing different shirts. One is wearing a yellow shirt, one is wearing a white tank top, one is wearing a black shirt, one is wearing a red shirt, and one is wearing a grey shirt. Though Person accurately states that he is the only individual depicted without a shirt, he does not explain how his shirtless photograph is impermissibly suggestive. When Abel observed Person standing outside of North Little Rock city hall, he was not shirtless. Abel testified that he was wearing a blue hooded sweatshirt, and she never mentioned

-11-

a gold necklace in her description of Person to the police. Moreover, Person points to no evidence in the record suggesting that Abel's identification was influenced by the fact that Person was depicted as shirtless or with a necklace. *Compare United States v. Harris*, 636 F.3d 1023, 1026-27 (8th Cir. 2011) (concluding that a photographic lineup was not impermissibly suggestive where the defendant's photograph had a unique attribute but the defendant failed to explain why the unique attribute suggested that the defendant committed the crime) *with United States v. Baykowski*, 583 F.2d 1046, 1047-48 (8th Cir. 1978) (holding that a photo array was impermissibly suggestive where the victim identified a burglary defendant based on his sweater worn in the array, which was stolen in the burglary). We affirm the denial of Person's motion to suppress. *See United States v. Donelson*, 450 F.3d 768, 773 (8th Cir. 2006) (holding that a photo array was not impermissibly suggestive where, as here, the array "contained pictures of six individuals with similar physical characteristics and no other identifying information" (citing *Manson v. Brathwaite*, 432 U.S. 98, 117 (1977))).[5]

### D. Gilbert's Sentence

At Gilbert's sentencing, the district court applied a two-level enhancement based on its finding that Gilbert abused a position of trust by using his police radio to monitor law enforcement activity while his accomplices attempted to rob an AAC truck. *See* U.S.S.G. § 3B1.3. "Whether the defendant *may* occupy a position of trust is a question of law; if so, whether [he] *did* is a question of fact." *United States v. Hayes*, 574 F.3d 460, 478 (8th Cir. 2009). "We review the legal component of the

---

[5]Because we conclude that the lineup was not impermissibly suggestive, we need not address Person's argument that the identification procedure created a substantial likelihood of irreparable misidentification. *See Harris*, 636 F.3d at 1026 ("Only if the photographic lineup was impermissibly suggestive must we proceed to analyze, under the totality of the circumstances, whether the impermissibly suggestive lineup created a likelihood of misidentification violating due process.").

abuse of trust determination de novo and the district court's factual findings for clear error." *United States v. Anderson*, 349 F.3d 568, 573 (8th Cir. 2003). "Because police officers clearly occupy positions of public trust, the inquiry in most cases is whether defendant used a police officer's special knowledge or access to facilitate or conceal the offense." *United States v. Baker*, 82 F.3d 273, 277 (8th Cir. 1996). Gilbert concedes that he occupied a position of trust because he was a police officer but argues that the district court clearly erred in finding that he abused his position of trust to facilitate the conspiracy.

The district court found that "Mr. Gilbert's job in the conspiracy was to listen to the police radio . . . so he could notify the other co-conspirators if there was a police call that went out and give them the heads-up." Based on this finding, the district court concluded that Gilbert's abuse of his position of trust "did contribute in some significant way to facilitating the commission of the conspiracy." This finding is consistent with the record, as Williams and Davis both testified at trial that one of Gilbert's roles in the conspiracy was to listen to his police radio so that he could alert his accomplices if a patrol car had been dispatched to the location of the robbery. We therefore conclude that the district court did not clearly err by finding that Gilbert used his special knowledge or access to facilitate or conceal the offense. *See Baker*, 82 F.3d at 277.[6]

## III. Conclusion

For the foregoing reasons, we affirm.

_____

_____

[6]Gilbert does not challenge the substantive reasonableness of his sentence.