_____

No. 95-2128
_____

United States of America,              *
                                       *
        Plaintiff-Appellee,            *
                                       *
    v.                                 *
                                       *
Thomas Joseph McCarthy,                *
                                       *
        Defendant-Appellant.           *


_____

No. 95-2508
_____

United States of America,              *
                                       *
        Plaintiff-Appellee,            *     Appeals from the United States
                                       *     District Court for the
    v.                                 *     District of Minnesota.
                                       *
Clarence William Houston, also         *
known as C. W. Houston,                *
                                       *
        Defendant-Appellant.           *


_____

No. 95-2512
_____

United States of America,              *
                                       *
        Plaintiff-Appellee,            *
                                       *
    v.                                 *
                                       *
John Walter Piner,                     *
                                       *
        Defendant-Appellant.           *

_____

No. 95-2513
_____

United States of America,          *
                                    *
          Plaintiff-Appellee,       *
                                    *
     v.                             *
                                    *
Carl Luverne Thompsen,              *
                                    *
          Defendant-Appellant.      *


_____

No. 95-2935
_____

United States of America,          *
                                    *
          Plaintiff-Appellee,       *
                                    *
     v.                             *
                                    *
Michael Arney Ness,                 *
                                    *
          Defendant-Appellant.      *


_____

No. 95-3333
_____

United States of America,          *
                                    *
          Plaintiff-Appellee,       *
                                    *
     v.                             *
                                    *
Stephen Lloyd Labrie,               *
                                    *
          Defendant-Appellant.      *


_____

Submitted:  February 14, 1996

Filed:  October 10, 1996

_____

Before McMILLIAN, LAY, and HANSEN, Circuit Judges.
_____

HANSEN, Circuit Judge.

Thomas McCarthy, Clarence Houston, John Piner, Carl Thompsen, Michael Ness, and Stephen Labrie appeal from judgments entered against them by the district court[1] on various drug and drug-related charges. The appellants raise numerous issues concerning their convictions and sentences. After carefully considering the merits of their individual claims, we affirm the judgment of the district court in each case.

I.

This case involves a large and intricate marijuana importation and distribution network in which each appellant played a role. The network comprised a conspiracy to import marijuana into the United States from Colombia and another conspiracy involving distribution and possession with intent to distribute marijuana in the United States. Ron Scoggins, a cooperating witness for the government, had been involved in importing and selling marijuana for at least 20 years, and his business associate, appellant Carl Thompsen, was the primary underwriter of the operations. Scoggins organized the entire network, planning the importation scheme as well as the delivery of the marijuana to brokers and dealers at various points around the United States once it was safely within our borders.

The importation conspiracy entailed the shipment of an approximately 5,000-pound load of marijuana from sources in Colombia. The cache was transported by a sailboat, The Delphene,

_____

[1]The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota.

up the Pacific coastline and offloaded at a site near Santa Barbara, California, in July 1989.[2]  The shipment was then transported to Scoggins' Templeton, California, ranch for further processing and distribution throughout the United States.

The distribution conspiracy involved the July 1989 marijuana offload in California, which was then distributed throughout the United States; the distribution of a quantity of marijuana that had been imported into Florida in late 1988; and also a large quantity (7,500 pounds) distributed from a subsequent California importation in 1992.  Sizeable quantities from the California offloads were shipped to Thompsen in Minnesota, where he and others distributed the drug to local dealers for further distribution.

On September 28, 1993, Thompsen and Scoggins were arrested by federal law enforcement officers in Minnesota.  A federal grand jury subsequently indicted 24 individuals, including each of the appellants, on various drug and asset forfeiture charges.  Thompsen, McCarthy, and Labrie pleaded guilty to drug charges.  Houston, Piner, and Ness proceeded to trial on the charged drug offenses and were each found guilty of at least one count.

## II.

On appeal, Houston, Piner, and Ness challenge their convictions; Thompsen challenges the basis for his guilty plea; and Ness, Thompsen, McCarthy, and Labrie challenge their sentences.

---

[2]The civil forfeiture of <u>The Delphene</u> was recently affirmed by a different panel.  <u>See</u> <u>United States v. One 1970 36.9' Columbia Sailing Boat</u>, 91 F.3d 1053 (8th Cir. 1996).

**A.**

Houston, Piner, and Ness challenge the sufficiency of the evidence to sustain their convictions. In reviewing these claims, we view the evidence in the light most favorable to the guilty verdict, granting the government every reasonable inference therefrom. United States v. Jenkins, 78 F.3d 1283, 1287 (8th Cir. 1996). We will reverse the convictions only if we can conclude from the evidence that a reasonable fact finder must have entertained a reasonable doubt about the government's proof concerning one of the essential elements of the crime. United States v. Bascope-Zurita, 68 F.3d 1057, 1060 (8th Cir. 1995), cert. denied, 116 S. Ct. 741 (1996).

Ness was convicted of conspiracy to distribute and possess with intent to distribute marijuana. Piner was convicted of conspiracy to import marijuana into the United States. Houston was convicted of both. To prove that Houston, Piner, and Ness were participants in the respective drug conspiracies, the government was required to show evidence that two or more people, including the named defendant, reached an agreement and the purpose of the agreement was a violation of the law. Jenkins, 78 F.3d at 1287. "The agreement need not be formal; a tacit understanding will suffice. Moreover, the government may prove the agreement wholly by circumstantial evidence or by inference from the actions of the parties." United States v. Shoffner, 71 F.3d 1429, 1433 (8th Cir. 1995) (internal quotations omitted). However, the government cannot rely merely on the appellants' knowledge of the conspiracy's existence in order to hold them accountable; rather, it must also show some degree of involvement and participation on their part. United States v. Fregoso, 60 F.3d 1314, 1323 (8th Cir. 1995).

The appellants do not argue that the government's proof, if believed, was insufficient to prove the existence of the charged

conspiracies (and after reviewing the evidence, we agree); instead, they contend that the evidence was insufficient to establish their involvement and participation in those conspiracies.  Once a conspiracy is established, however, "only slight evidence linking the defendant to the conspiracy is required to prove the defendant's involvement and support the conviction." Jenkins, 78 F.3d at 1287.

After reviewing the evidence in the light most favorable to the verdict, we conclude that the evidence with respect to each appellant is sufficient to support each conviction.  We begin with Houston.  Houston was involved with Scoggins in the planning, execution, and distribution of a late 1988 Florida offload, which initially proved to be unsuccessful.  Ultimately, Scoggins sold some of the quantity they did manage to bring on shore, but instead of paying Houston his agreed upon share, Scoggins invested Houston's money in the California import venture, which took place the next year.

Houston agreed to transport Scoggins' power boat from Florida to California to be used in the California importation operation.  Scoggins made a series of phone calls to Houston in June of 1989 to organize the logistics of the boat's transportation.  Scoggins later sent two packages to Houston via Federal Express containing a total of approximately $10,000 as partial payment on the amount Scoggins owed Houston for the earlier Florida deal, and the remainder was for the purchase of a trailer to transport the boat across the country.

Houston transported Scoggins' boat to Oxnard, California, arriving on July 3, 1989.  While there, he stayed in a hotel room paid for by Scoggins and worked with others preparing the boat for the offloading operation.  Houston also discussed with Scoggins the possibility of piloting a small sailboat as a precautionary

auxiliary craft during the offloading operation. During a two-hour excursion test of Scoggins' boat after it had been transported to California, Scoggins, Houston, and others discussed the details of the upcoming offloading operation. Houston was to receive a three-to-one return on the money that Scoggins had invested in the California operation without Houston's permission.

Medical problems prevented Houston from sailing the auxiliary boat during the July 15, 1989, importation and unloading operation as planned, but he returned to California in September to pick up a share of the imported marijuana. He met with Scoggins, Thompsen, and another coconspirator, Timothy Tyler. Scoggins instructed Tyler to give Houston 300 pounds of marijuana. Tyler took Houston to a storage locker in Shingle Springs, California, which was filled with marijuana, and Houston took a truckload of marijuana without making any payment.

Houston testified at trial that he brought the boat to Oxnard, California, and he admitted that he associated with Scoggins and others involved in the operation. He also admitted that he went out on the two-hour boat ride with Scoggins and others. He stated that he knew that Scoggins and the others lived in Northern California and did not know why the group was in Oxnard, which is in Southern California. He testified that he suspected that Scoggins' group was into some sort of illegal operation. Houston admitted at trial that he had returned to California in September 1989 and that he met with Scoggins and Tyler at that time. While he was in custody for this case, Houston bragged to another coconspirator that he had taken marijuana from the imported load without paying Scoggins.

Viewing the evidence in the light most favorable to the verdict, we have no difficulty concluding that the government offered much more than the evidence necessary to link Houston with

-7-

the conspiracy that undoubtedly existed. A reasonable fact finder easily could have concluded that Houston was an active participant in the importation and distribution conspiracies.

Piner's challenge to the sufficiency of the evidence is similarly unpersuasive. Piner was convicted of conspiracy to import marijuana into the United States. Scoggins began developing plans for the 1989 California importation operation in late 1988. Scoggins planned to ship the marijuana from Central America or South America up the Pacific Coast to California, and consequently needed a boat and a captain. An unindicted coconspirator, Bob Brewer, provided Piner's name to Scoggins as someone who was capable of performing the task. Brewer told Scoggins that Piner had a sailboat, that Brewer had previously assisted Piner in such an operation, and that Piner had proven to be quite competent.

Scoggins later met Brewer and Piner in Panama, where they discussed the possible methods of transporting marijuana from Colombia into California. They discussed the possibility of moving a 5,000-pound load, which Scoggins estimated to be worth $3,000,000 wholesale, and splitting the profits from the venture. They also settled on a destination -- a place off the coast of California near Santa Barbara. Various credit card bills and Piner's passport reveal that he was in Panama during the time when the alleged meeting took place.

The first attempt failed when the Colombian marijuana suppliers failed to show up to meet Piner and his sailboat at a rendezvous island. Scoggins was told that the shipment was lost at sea, an explanation he disbelieved. Scoggins and Piner later met in Costa Rica to discuss the reasons for the failure and to plan a second operation. Arrangements were made for Piner to acquire a load of approximately 5,000 pounds of marijuana at Monterosa, an island off the coast of Costa Rica. Piner was to deliver the

marijuana in mid-July to the same destination as previously agreed upon, near Santa Barbara. As scheduled, Piner delivered a load of approximately 5,000 pounds of marijuana to the designated site on July 15, 1989. Scoggins, Brewer, and others were prepared for Piner's arrival. Scoggins and his cohorts took Scoggins' power boat and a number of life rafts out to sea to meet Piner. Piner and Tyler handed marijuana bales from The Delphene overboard to Scoggins, who was standing in his power boat tied alongside. Scoggins then handed the bales to others for packing on the life rafts. The marijuana load was taken to shore and thereafter transported in trucks to Scoggins' nearby ranch.

After completing the unloading process, Piner joined Scoggins and others at the Black Oak Hotel in Paso Rables, California, which was near Scoggins' ranch. Hotel records from the Black Oak Hotel confirm that Piner registered there on July 25. Piner's address book contained an entry listing a "Ron" (Scoggins' first name) at the Black Oak Hotel in room 355. The entry also contained the Black Oak's telephone number and Scoggins' home telephone number. Hotel records confirm that Scoggins stayed in room 355. Piner and Scoggins later went to Scoggins' ranch where the marijuana was stored. Scoggins paid Piner for transporting the marijuana, tendering payment both in currency and a quantity of marijuana.

Viewing the record in the light most favorable to the verdict, we conclude that the government presented overwhelming evidence of Piner's participation in the conspiracy to import marijuana into the United States.

Ness also challenges the sufficiency of the evidence. Ness was convicted of conspiracy to distribute and possess with intent to distribute marijuana. Ness's activities were limited solely to distribution of the marijuana in Minnesota. Thompsen's testimony was the primary evidence against him. Thompsen testified that, in

Minnesota in December 1989, he received a shipment of the California marijuana that had been imported in July 1989, delivered in a pickup truck camper. Thompsen parked the marijuana-filled pickup truck in front of the residence of another coconspirator. Thompsen and Ness had previously agreed that Ness would obtain portions of the shipment for local distribution. Consequently, Thompsen personally delivered to Ness numerous portions of the shipment, ranging in size from 30 to 50 pounds, until the quantity in the pickup truck was exhausted. Thompsen testified that it took Ness approximately two weeks to sell all of the marijuana in the pickup truck. After Ness had disposed of the entire quantity, Thompsen collected the proceeds from Ness and drove to California to split the proceeds with Scoggins.

This process was repeated on two subsequent occasions, with Thompsen receiving a shipment of marijuana in Minnesota from Scoggins in California. One additional shipment originated from the 1989 California import operation, and another shipment originated from the 1992 California operation.

Thompsen, who had agreed to cooperate with law enforcement officers after his arrest in September 1993, met with Ness on two subsequent occasions. These two meetings were tape-recorded by law enforcement officers and played for the jury at trial. On one of the tapes, Ness indicated that he would like to purchase a 50-pound quantity of marijuana to sell to a new customer. Ness also made other statements in this tape that referred to Ness's drug buyers as well as to prior transactions between Thompsen and Ness. At times, Thompsen and Ness used code names to describe various drugs. Thompsen testified at trial concerning his understanding of the meaning of the code words spoken by him and Ness.

Ness argues that this evidence does not establish that he knew of or intended to join the large marijuana distribution conspiracy

in this case.  Rather, he contends that the extent of his involvement was limited to his transactions with Thompsen, which consisted of independent buyer-seller transactions that were not part of the overall distribution conspiracy.  He claims that he knew nothing about the extent of the conspiracy or the identity of other coconspirators, and that he was not acting to further the conspiracy.  Ness in effect argues that at most he entered into a separate conspiracy with Thompsen, which was different in kind and purpose from that charged in the indictment and, as such, his conspiracy to distribute conviction must be vacated for insufficient evidence.  We disagree.

"One does not have to have contact with all of the other members of a conspiracy to be held accountable as a conspirator." Bascope-Zurita, 68 F.3d at 1061.  Notwithstanding a defendant's lack of knowledge of the identity of all of the other coconspirators or his failure to appreciate the extent of the enterprise, a defendant can be held liable as a coconspirator if he shares the same common purpose or goal of the other conspirators.  Id.  "To determine whether multiple conspiracies exist when a single large conspiracy has been charged by the government, this Court considers the totality of the circumstances, `including the nature of the activities involved, the location where the alleged events of the conspiracy took place, the identity of the conspirators involved, and the time frame in which the acts occurred.'" United States v. Darden, 70 F.3d 1507, 1518 (8th Cir. 1995) (quoting Bascope-Zurita, 68 F.3d at 1061), cert. denied, 116 S. Ct. 1449 and 116 S. Ct. 2567 (1996).  "`A single conspiracy may be found when the defendants share a common overall goal, . . . even if the actors are not always the same.'"  Id. at 1520 (quoting Bascope-Zurita, 68 F.3d at 1061) (alteration in original).  "Thus, if the activities of a defendant . . . facilitated the endeavors of other alleged coconspirators or facilitated the venture as a whole, the necessary interdependence of the alleged conspirators' acts --

reflecting the conspirators' coincidence of interests and a knowing coordination of efforts to produce a result in harmony with those interests -- is present." United States v. McCoy, 86 F.3d 139, 141 (8th Cir. 1996) (internal quotations omitted) (alteration in original).

In this case, the totality of the circumstances leads to the conclusion that sufficient evidence is present to link Ness to the conspiracy to distribute marijuana as charged in the indictment. Viewing the evidence in the light most favorable to the verdict, the evidence shows that Ness had knowledge that Thompsen obtained the marijuana through the large distribution framework already in place. Ness was aware of the identity of several other coconspirators who were dealing with Thompsen, and Ness shared a common purpose with the other members in the distribution scheme -- to distribute the marijuana which had been obtained in the 1989 California import operation. Ness's local distribution in Minnesota of large amounts of marijuana facilitated the endeavors of other coconspirators, specifically Thompsen, as well as the venture as a whole. On the facts of this case, we conclude that the government offered sufficient evidence to link Ness to the charged conspiracy which he admits existed.[3]

Houston, Piner and Ness also attack the credibility of the government witnesses who testified against them, arguing that no reasonable juror could have found the government witnesses' testimony to be credible. They point to discrepancies in the

---

[3]Ness also claims that his conspiracy conviction must be vacated because the government failed to prove that he actually possessed marijuana. This argument is without merit. Proof of a conspiracy under 21 U.S.C. § 846 requires only proof of an agreement to engage in distributing drugs; proof of an overt act in furtherance of the conspiracy is not required under § 846. United States v. Shabani, 115 S. Ct. 382, 383 (1994); United States v. Rodgers, 18 F.3d 1425, 1428-29 (8th Cir. 1994).

-12-

testimony of the government witnesses, a strong motive to fabricate, the government witnesses' histories of drug and alcohol abuse, and the fact that the government witnesses received favorable deals from the government in return for testifying against the appellants.

"We recognize that the testimony of the witnesses may have been inconsistent at times. It was the jury's duty, however, to weigh the credibility of the defendant's co-conspirators regarding the day-to-day transactions of the operation." Jenkins, 78 F.3d at 1287. "[W]e must resolve issues of credibility in favor of the verdict, and we decline to invade the province of the jury as [the appellants] would have us do." Fregoso, 60 F.3d at 1323. The jury was fully informed of all factors bearing on the credibility of the government witnesses. After having heard all of the testimony and arguments, the jury credited the testimony of the government witnesses, as it was entitled to do. Based upon our own independent review of the record, we reject the appellants' claims that a reasonable fact finder would have rejected the testimony of the government witnesses. Accordingly, we hold that the evidence was more than sufficient to sustain the conspiracy convictions of Houston, Piner, and Ness, and the district court properly denied their motions for judgment of acquittal.

**B.**

Piner contends that the district court abused its discretion when it admitted evidence of other crimes and bad acts attributed to him. Specifically, Piner challenges the district court's admission of testimony that Piner had previously been involved in smuggling marijuana in Trinidad and had previously offloaded marijuana with Brewer and Tyler at the same spot that was used for the 1989 marijuana smuggling operation, as well as in San Francisco. The district court admitted this testimony as relevant

to establishing Piner's intent to join the conspiracy, his knowledge of marijuana smuggling in general, his knowledge of this conspiracy's objectives, and Piner's marijuana business relationship with Brewer, Scoggins, Tyler, Nelson, and others.

Federal Rule of Evidence 404(b) governs the admissibility of other crimes or bad acts. Rule 404(b) permits introduction of this evidence to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake," but prohibits the admission of such evidence to establish the character of the defendant in an effort to show that he acted in conformity with that character. Fed. R. Evid. 404(b). We have adopted a four-part test to determine whether other crimes evidence is admissible under Rule 404(b). Such evidence is admissible when it is "(1) relevant to a material issue; (2) proved by a preponderance of the evidence; (3) higher in probative value than in prejudicial effect; and (4) similar in kind and close in time to the crime charged." United States v. Shoffner, 71 F.3d 1429, 1432 (8th Cir. 1995) (internal quotations omitted). Rule 404(b) is a rule of inclusion, United States v. Baker, 82 F.3d 273, 276 (8th Cir. 1996), and precludes "evidence that tends solely to prove the defendant's criminal disposition." Shoffner, 71 F.3d at 1432. We review the admission of other crimes evidence for an abuse of discretion. United States v. Mejia-Uribe, 75 F.3d 395, 397 (8th Cir.), petition for cert. filed, (U.S. June 14, 1996) (No. 95-9404). We will reverse only where the defendant can establish that the challenged evidence had no bearing on any issues in the case. United States v. Butler, 56 F.3d 941, 944 (8th Cir.), cert. denied, 116 S. Ct. 322 (1995).

Piner challenges the admission of the other crimes or bad acts evidence on four grounds. First, he contends that the government did not establish the prior bad acts or crimes by clear and convincing evidence. This claim is specious. This circuit has repeatedly held that other crimes or prior acts need only be proved

by a preponderance of the evidence and not by clear and convincing evidence. See, e.g., Baker, 82 F.3d at 276; Shoffner, 71 F.3d at 1432; United States v. Yellow, 18 F.3d 1438, 1441 (8th Cir. 1994). This has been the law since Huddleston v. United States, 485 U.S. 681, 685 (1988), and no further discussion is warranted.

Second, Piner claims that Scoggins' testimony, which included out-of-court statements by unindicted coconspirator Brewer concerning Piner's prior acts, was unreliable and not probative. Piner argues that Scoggins' testimony concerning Brewer's statements to Scoggins about Piner's involvement in transportation of marijuana lacks reliability because Scoggins is a coconspirator and because Piner did not have the opportunity to examine Brewer about these points. Piner does not explicitly claim that the evidence is hearsay but relies on hearsay principles in arguing the unreliability of the testimony. Whatever the basis of Piner's reliability argument, we reject it. To the extent that Brewer's out-of-court statements pose a hearsay issue, we are convinced they are statements made by a coconspirator during the course and in furtherance of the conspiracy and thus are admissible under Federal Rule of Evidence 801(d)(2)(E). See United States v. Lenfesty, 923 F.2d 1293, 1296 (8th Cir.), cert. denied, 499 U.S. 968 (1991) (agent's testimony concerning details of a drug ring learned through statements of a nontestifying coconspirator was not hearsay under Rule 801(d)(2)(E) because statements were made by a coconspirator, during and in furtherance of the conspiracy). The district court heard the testimony, had the opportunity to evaluate the credibility of the witnesses, and found the evidence to be admissible. After carefully reviewing the record, we agree with the district court that Scoggins' testimony was admissible and sufficient to establish, by a preponderance of the evidence, that Piner committed the prior acts.

Third, Piner argues that the other acts were not substantially similar to, or close in time to, the offenses charged in this case. The claim that the acts were not similar to the crimes charged in this case is, charitably speaking, meritless. The other acts concerned the transporting, unloading, and dealing of marijuana that Piner transported by himself on his sailboat, conduct which is identical to that charged in the instant offenses. Further, this similar conduct culminated at the same offloading site near Santa Barbara as was used in this case.

The timeliness argument, on the other hand, presents a more difficult question. Scoggins testified that Brewer informed him that Piner had been involved in an offloading marijuana operation in 1978. This was some 17 years before the trial in this case, but only 10 or 11 years prior to the inception of the conspiracy with which Piner is charged in this case. Tyler testified that he had been involved in a drug import operation with Brewer in 1973, at the same location involved in this case. We have upheld the introduction of evidence relating to acts or crimes which occurred 13 years prior to the conduct challenged. See United States v. Engleman, 648 F.2d 473, 479 (8th Cir. 1981). We have been reluctant to go beyond Engleman's 13-year time frame. See Mejia-Uribe, 75 F.3d at 398.

The testimony in this case, while pushing hard the outside boundary of our ideas of timeliness, did not involve a single, isolated bad act, but instead it involved a continuous series of events leading up to the conduct charged in this case. The conspiracy charged in the count of the indictment of which Piner was convicted began in 1988, but continuous similar conduct by some of the defendants, including Piner, had been ongoing for years, stretching back into the 1970s. These prior bad acts were not simply remote, unrelated events as in Mejia-Uribe, 75 F.3d at 398, but rather were part and parcel of the ongoing drug activities in

-16-

which Piner was engaged, and they demonstrate how he became involved in the charged conspiracy.  Because the evidence relating to Piner's bad acts is distinguishable in this manner, from that which we have disapproved of in prior cases, id. at 398-99, we conclude that the acts were sufficiently close in time in this context to be relevant to intent and knowledge.

Fourth, Piner claims that the evidence was unduly prejudicial. Federal Rule of Evidence 403 defines "unfair prejudice" as that which has "`an undue tendency to suggest decision on an improper basis.'"  Yellow, 18 F.3d at 1442 (quoting Fed. R. Evid. 403, advisory committee note).  In this case, although the evidence was prejudicial to Piner, as is most evidence offered against defendants, it was not unfairly prejudicial; that is, the prejudice did not substantially outweigh the probative value of the evidence.  Butler, 56 F.3d at 944.  In any event, we have in the past been reluctant to find that the evidence was unfairly prejudicial when the district court gave an appropriate limiting instruction, instructing the jury not to use the evidence as proof of the acts charged in the indictment.  Baker, 82 F.3d at 276; Butler, 56 F.3d at 944.  That principle is fully applicable in this case where the district court provided a very adequate limiting instruction.  Accordingly, the admission of evidence of Piner's other bad acts and crimes provides no basis for reversing Piner's conviction.

## c.

Ness, who distributed throughout Minnesota large amounts of the marijuana imported in California, challenges his sentence, contending that the district court erred in failing to grant him either a two- or four-level downward adjustment to his base offense level for being a minor or minimal participant in the offense, pursuant to the United States Sentencing Commission, Guidelines Manual, § 3B1.2(a)-(b) (Nov. 1994). Section 3B1.2 permits a court

-17-

to grant a defendant a four-level decrease in his base offense level if it finds that the defendant is a minimal participant in the offense and a two-level decrease if the defendant is a minor participant within the meaning of the Guidelines.  We review the district court's factual determinations regarding a participant's role in the offense for clear error.  United States v. Flores, 73 F.3d 826, 835 (8th Cir.), cert. denied, 116 S. Ct. 2568 (1996); United States v. Fregoso, 60 F.3d 1314, 1329 (8th Cir. 1995).

Ness argues that his allegedly de minimis role in the context of this extensive conspiracy entitles him to a reduction under USSG § 3B1.2.  Ness's relevant conduct involved distributing marijuana in Minnesota.  The evidence at trial indicated that the overall conspiracy imported and attempted to distribute in excess of 5,000 pounds of marijuana.  However, the district court did not hold Ness accountable for the entire amount chargeable to the conspiracy.  Rather, the court attributed to Ness 220 pounds of marijuana, which is the actual amount that the district court determined Ness obtained from Thompsen and distributed.  Ness's argument would have considerable force if the district court had attributed to Ness the entire 5,000-plus pounds imported and distributed by the conspiracy.  As it is, however, Ness actually seeks a double reduction to his base offense level.  He would have us attribute only 220 pounds to him in calculating his base offense level and yet consider the entire 5,000 pounds attributable to the conspiracy in determining his role in the offense.  We conclude that this would be contrary to the Guidelines.

When a defendant is part of jointly undertaken criminal activity with others, the sentencing court must determine what the defendant's relevant conduct was in that activity using the provisions of USSG § 1B1.3, "Relevant Conduct (Factors that Determine the Guideline Range)."  Once a defendant's relevant conduct for sentencing purposes has been determined, that same

relevant conduct is used not only in determining the defendant's base offense level, but also for any role in the offense adjustments made pursuant to Chapter 3 of the Guidelines.  USSG § 1B1.3(a)(iv).

With respect to Ness, the district court held him accountable at sentencing only for the relevant conduct of distributing 220 pounds of marijuana in Minnesota, even though the jury had found him guilty of the larger conspiracy charged in Count I of the Indictment.  Having determined that his relevant conduct for sentencing purposes was the distributions made in Minnesota, the court, in determining whether or not to grant Ness a downward adjustment for being a minor or minimal participant, was required by USSG 1B1.3(a)(iv) to assess Ness's role within the context of that already defined relevant conduct (i.e., the Minnesota distributions). It is clear from the evidence that Ness was a principal actor in the Minnesota distributions, and accordingly he was not entitled to the benefit of a downward adjustment for being either a minor or minimal participant in the relevant conduct for which he is being held accountable at sentencing, even though that same relevant conduct is and was sufficient for the jury to find him guilty of the much larger conspiracy charged in Count I.  His case is a clear example of the difference between what the Sentencing Commission calls "sentencing accountability" and criminal liability determined by the substantive criminal law, in this case the law of conspiracy.  See USSG § 1B1.3, comment. (n.1) (Nov. 1994).  Accordingly, a further reduction for role in the offense is not warranted, and we find no error in the district court's refusal to do so.

**D.**

Thompsen claims that his guilty plea was defective.  Thompsen pleaded guilty to one count of conspiracy to distribute marijuana, in violation of 21 U.S.C. § 846, and one count of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A).  Thompsen claims that he should be allowed to withdraw his guilty plea because the district court failed to advise him that he would not be permitted to withdraw from his plea of guilty if the district court did not accept the government's recommendation concerning his sentence.  See Fed. R. Crim. P. 11(e)(2).  The government responds that Thompsen's was not a Rule 11(e)(1)(B) guilty plea, which is required to trigger the warning requirement under Rule 11(e), and even if it was, any error was harmless under Rule 11(h).  We review these claims de novo. United States v. Vaughn, 7 F.3d 1533, 1535 (10th Cir. 1993), cert. denied, 114 S. Ct. 1553 (1994).

We note at the outset that the district court did not give the warning required under Rule 11(e)(2).  Rule 11(e)(1)(B) states that a defendant contemplating a plea of guilty may enter into an agreement that, in return for the defendant's plea of guilty, the government will "make a recommendation, or agree not to oppose the defendant's request, for a particular sentence . . . ."  Rule 11(e)(2) in turn states that, before the court accepts a plea, if the plea agreement is of the type set forth in Rule 11(e)(1)(B), the district court must inform the defendant that the defendant will not be permitted to withdraw his plea if the court does not follow the government's recommendation or the defendant's request for a particular sentence.  The government contends that promising to make a recommendation for a downward departure is not recommending a "particular sentence" within the meaning of Rule 11(e)(1)(B) that triggers the warning requirement.

We need not decide in this case whether the government's promise to recommend a downward departure is a "particular sentence" (although we doubt that it is), because the district court's failure to expressly give the required warning can be harmless error.  See Fed. R. Crim. P. 11(h) ("Any variance from the procedures required by this rule which does not affect substantial rights shall be disregarded.")  See also United States v. Lowery, 60 F.3d 1199, 1206 (6th Cir. 1995).  In this case, even assuming the district court erred by failing to give the Rule 11(e)(2) warning, we conclude that the error was harmless.

Although we have not had occasion to address what constitutes Rule 11(h) harmless error in the context of a failure to give the required Rule 11(e)(2) warning, we adopt the analysis set forth by our sister circuits. "In addressing the harmless error rule of subsection 11(h), the district court's error warrants reversal only if it had a significant influence on [the defendant's] decision to plead guilty."  Vaughn, 7 F.3d at 1535.  "The question of whether such an error may be harmless depends on whether the defendant's knowledge and comprehension of the full and correct information would have been likely to affect his willingness to plead guilty."  United States v. Diaz-Vargas, 35 F.3d 1221, 1224 (7th Cir. 1994) (internal quotations and citations omitted).  The failure to give the warning is not harmless error if there is a realistic likelihood that the appellant pleaded guilty under the misapprehension that he could withdraw his plea if the court did not follow the government's recommendation.  Id. at 1225; United States v. DeBusk, 976 F.2d 300, 306 (6th Cir. 1992); United States v. Theron, 849 F.2d 477, 480 (10th Cir. 1988).  Similarly, the error is not harmless if the appellant can present evidence that he would not have pleaded guilty had the district court given the warning.  Vaughn, 7 F.3d at 1535; Diaz-Vargas, 35 F.3d at 1224.

Under the facts of this case, we conclude that if the district court erred in failing to give the required Rule 11(e)(2) warning, the error was harmless. We reach this conclusion because, after fully and carefully reviewing the record, we believe that even if Thompsen would have been given a Rule 11(e)(2) warning, he still would have pleaded guilty, because the warning would have added precious little to the knowledge he already possessed about the plea process. Thompsen has offered no record evidence that he was confused at the time of his plea concerning the possible sentences he could receive, or that he would be able to withdraw his plea if the district court did not follow the government's recommendations to depart downward. At the change-of-plea hearing, the district court expressly informed Thompsen that the court was not required to accept any recommendation from the parties concerning a particular sentence, and Thompsen expressly acknowledged his understanding of this statement. Thompsen told the district court that he had met with his attorney 30 to 40 times and that they had discussed the terms of the plea agreement on several occasions.

The plea agreement itself expressly provided as follows:

> The defendant understands that the calculation and application of the Guidelines is entirely up to the Court. He also understands that the Court has the discretion to grant or deny either or both of the motions for downward departure from the Guidelines and from the statutory mandatory minimum.

> The above-stated position of the parties with respect to sentencing factors is not binding upon the Court. If the factors are determined by the Court to differ from those stated above, the defendant shall not be entitled to withdraw from the plea agreement.

(Thompsen Addend. at 67.) This language is the equivalent of the warning required under Rule 11(e)(2). Thompsen makes no claim that he did not understand these provisions. In fact, Thompsen initialed each separate page of the plea agreement to indicate that

-22-

he had read the provisions and understood them.  Thompsen also indicated at the change-of-plea hearing that he had read the plea agreement and understood its provisions.  Under questioning by the district court, he acknowledged that his plea did not guarantee any particular outcome regarding his sentence.  Although some courts have held that the defendant's mere reading of the plea agreement itself, without the required warning under Rule 11(e)(2), is insufficient to constitute harmless error, see United States v. Kennell, 15 F.3d 134, 138 (9th Cir. 1994), other courts have held that the written plea agreement may be considered in determining whether the failure to give the Rule 11(e)(2) warning was harmless.  See Diaz-Vargas, 35 F.3d at 1225.  Courts have also looked to the language of the plea agreement to determine whether there was a reasonable basis for a defendant to argue that he was confused about the terms of the plea agreement.  See United States v. Zickert, 955 F.2d 665, 668 (11th Cir. 1992).  Here, the terms of the plea agreement could not have been clearer or more explicit.  Thompsen was a prominent local businessman who possessed a master's degree in behavioral science from Kennedy-Western College and he had done some doctoral work.  He was a university certified chemical dependency counselor.  Thompsen never moved to withdraw his plea and never evidenced confusion or any misunderstanding that he could withdraw his guilty plea.  These facts, coupled with Thompsen's signing of each page of the plea agreement and his statement at various points in the proceedings that he understood the written plea agreement, leads us to conclude that Thompsen was well aware that he could not withdraw his plea if he was unhappy with the district court's sentence.  See Diaz-Vargas, 35 F.3d at 1225 ("The signed plea agreement, coupled with the defendant's testimony that he understood its terms (which expressly included the substance of a Rule 11(e)(2) admonition), indicates that Diaz-Vargas understood that he would be bound by the plea regardless of the actual sentence imposed.").  Accordingly, we reject Thompsen's

claim that the district court committed reversible error by failing to provide him with the warning mandated by Rule 11(e)(2).[4]

## E.

Thompsen claims that the district court considered improper factors and relied on inaccurate information when determining the extent of departure to grant him pursuant to the government's USSG § 5K1.1 and 18 U.S.C. § 3553(e) departure motions. As noted above, Thompsen pleaded guilty to one count of conspiracy to distribute marijuana and one count of money laundering. The marijuana conspiracy count generated the greater Guidelines range: Based on a total offense level of 35 and criminal history category of III, Thompsen was subject to a Guidelines range of 210 to 262 months of imprisonment. Based on the quantity of marijuana attributable to him, Thompsen was also subject to a statutory mandatory minimum sentence of ten years. See 21 U.S.C. § 841(b)(1)(A). Consistent with Thompsen's assistance and pursuant to the terms of the plea agreement, the government made motions both to depart below the statutory mandatory minimum under 18 U.S.C. § 3553(e) and the Sentencing Guidelines range under USSG § 5K1.1. The district court granted the motion to depart from the Guidelines range but denied the motion to go below the mandatory minimum sentence. The court imposed a sentence of imprisonment of 156 months, a downward

---

[4]We also reject Thompsen's claim that the district court never accepted his guilty plea and thus was without the power to impose a sentence on him. A fair reading of the record demonstrates that the district court informed Thompsen that the court conditionally accepted his plea with the right to reject it up until the date set for sentencing, but if the court did not exercise its right to reject it and instead proceeded with sentencing, the plea would be deemed fully accepted. (See Change of Plea Tr. at 30; see also Sentencing Tr. at 34-35 ("based upon your plea of guilty it is considered and adjudged that you are guilty of each of these offenses.").) Accordingly, Thompsen's bald-faced assertion that he was never adjudged guilty (Appellant's Br. at 32) is absolutely wrong.

departure of at least 54 months from the bottom of the applicable Guidelines range.

Thompsen challenges several aspects of the district court's departure decision. He first claims that the district court relied on improper factors in determining the extent of the departure pursuant to § 5K1.1 and in refusing to depart below the mandatory minimum range under § 3553(e). Specifically, he claims that in deciding the extent of the downward departure, the district court may only use the factors outlined in § 5K1.1, along with others that relate generally to the defendant's assistance. He suggests that in this case, the district court looked to other factors which are not outlined in § 5K1.1 and do not relate to a defendant's assistance to the government.

In this circuit, the extent of a district court's downward departure is not reviewable. United States v. Goodwin, 72 F.3d 88, 91 (8th Cir. 1995) (departure pursuant to § 5K1.1 and § 3553(e)). See also United States v. Karam, 37 F.3d 1280, 1284 (8th Cir. 1994) (departure pursuant to § 3553(e)), cert. denied, 115 S. Ct. 1113 (1995); United States v. Left Hand Bull, 901 F.2d 647, 650 (8th Cir. 1990) (departure pursuant to USSG § 5K2.10). We have held that "we may not review the extent of the district court's downward departure, regardless of the district court's reasons for refraining from departing further." United States v. Dutcher, 8 F.3d 11, 12 (8th Cir. 1993). Thompsen makes no allegation that the district court refused further departure on the basis of an unconstitutional motive or bad faith. See United States v. Alvarez, 51 F.3d 36, 41 (5th Cir. 1995) (holding once the district court has a valid reason for departing, the court may use any factor to determine the extent of the departure; the resulting sentence is unreviewable unless it is in violation of federal constitutional or statutory law). Moreover, the factors listed in § 5K1.1 that the court may use to consider the appropriate extent

of a departure for substantial assistance are in no way intended to be an exhaustive list, as that provision states, "[t]he appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, the consideration of the following."  USSG § 5K1.1(a) (emphasis added).

We have read the transcript of Thompsen's sentencing with care.  That record indicates that the district court properly considered Thompsen's assistance when ruling on these motions.  We decline the invitation to further circumscribe the district court's discretion by requiring it to examine each of the listed factors in § 5K1.1 on the record and explain exactly just what weight it gives to each in its departure decision.  All the statute and the Guidelines require is that the reasons for the departure be stated.  18 U.S.C. § 3553(c); USSG § 5K1.1(a).  Thompsen's argument to the contrary is merely an attempt to do an end run around our cases which hold that we cannot review the extent of a § 5K1.1 downward departure.  Accordingly, the district court's decision declining to depart further is unreviewable.[5]

_____

[5]Thompsen asserts United States v. Thomas, 930 F.2d 526 (7th Cir.), cert. denied, 502 U.S. 857 (1991), claiming it compels the conclusion that this court has jurisdiction to review the extent of the district court's downward departure.  Thompsen seizes on the Thomas court's language that "only factors relating to a defendant's cooperation should influence the extent of a departure for providing substantial assistance under § 3553(e)." In Thomas, however, the case was before the court on the government's appeal concerning the extent of the downward departure under 18 U.S.C. § 3742(b).  Under 18 U.S.C. § 3742(a), a defendant may challenge only the extent of an upward departure. Consistent with our holding above, a defendant cannot challenge the extent of a downward departure under § 3742(a)(2) as a sentence "imposed as a result of an incorrect application of the sentencing guidelines" because to permit such a challenge would render nugatory § 3742(a)(3).  Further, it is doubtful that the quoted statement from Thomas holds the meaning its unadorned language suggests.  In a later case, United States v. Correa, 995 F.2d 686, 686-87 (7th Cir. 1993), the Seventh Circuit found nothing improper about the district court's consideration of a variety of factors not delineated in § 5K1.1 to determine the extent of a downward

-26-

Thompsen is on even shakier ground with his claim that the district court erred in denying the government's § 3553(e) motion to depart below the statutory minimum sentence. There is no doubt that the district court knew it had the discretion to depart below the statutory minimum -- it had the required second motion from the government unleashing that discretionary power. It simply declined to exercise it. In this circuit, a district court's declination to depart downward when it knows it can do so is not reviewable on appeal. Jenkins, 78 F.3d at 1288; Goodwin, 72 F.3d at 89; United States v. Brown, 18 F.3d 1424, 1425 (8th Cir. 1994); United States v. Wilson, 955 F.2d 547, 552 (8th Cir. 1992). Unless, of course, the defendant made "a substantial threshold showing" that the district court's refusal to depart "was based on an unconstitutional motive." Wade v. United States, 504 U.S. 181, 186 (1992). We note that USSG § 5K1.1 and § 3553(e) leave to the district court the discretion whether or not to depart. As noted above, while USSG § 5K1.1(a) lists some of the factors that may bear on the extent of the reduction, we doubt the court's discretionary decision to depart (as opposed to the extent of the departure) is informed by anything except the government's making of the motion and the court's own views of whether or not the defendant's assistance meets the statutory threshold requirement that it be "substantial."

We have carefully examined Thompsen's other arguments with respect to his sentence. Specifically, Thompsen claims that the district court relied on inaccurate and false information in

---

departure, including the defendant's extensive and involved criminal history and the purity of the cocaine the defendant possessed. Because the district court had departed downward, the court held that it lacked jurisdiction to consider the defendant's appeal that the departure should have been greater because of the use of allegedly improper factors. Id. at 687. Thus, Thomas is distinguishable, and to the extent it is inconsistent with our result, we decline to follow it.

-27-

selecting a sentence and that the district court considered testimony from codefendants' hearings which was not contained in the presentence investigation report.  We conclude that these arguments are simply without merit.  We also reject as moot Thompsen's contention that this case should be assigned to a different district judge on remand.

**F.**

McCarthy challenges several aspects of his sentence.  First, he contends that the district court improperly calculated the quantity of marijuana attributable to him in determining his base offense level.  USSG § 1B1.3 provides that a defendant can be held accountable for criminal acts the defendant aided and abetted and, in cases of conspiracy, for reasonably foreseeable criminal acts committed by coconspirators in furtherance of the conspiracy.  The district court's drug quantity determination is a factual finding which we review under the clearly erroneous standard.  Flores, 73 F.3d at 833.  We may only reverse a drug quantity determination when we are firmly convinced that a mistake has been made.  Id.

At sentencing, Scoggins testified that McCarthy was present at Scoggins' ranch during the 1992 marijuana import operation.  While there, McCarthy served as a lookout while the other coconspirators were cleaning and drying over 2,000 pounds of marijuana.  McCarthy's job was to inform the other coconspirators when non-conspirators were approaching the ranch, as well as to help transport coconspirators to and from the cleaning site, to help move the processed marijuana, and to obtain necessary supplies for cleaning and drying the marijuana.  The district court determined that McCarthy knew that marijuana was being processed at the site and actually learned how to do it himself.  Based on this evidence, the district court determined that the entire quantity of the shipment should be attributed to McCarthy.

McCarthy claims that the district court should have only attributed to him a quantity of 150 pounds, the quantity that McCarthy transported back to Minnesota to Thompsen. He claims that he was not present at Scoggins' ranch when the 2,000-pound load of marijuana was being dried and processed, but rather stayed at a local hotel until he was informed that his order of 150 pounds was processed and ready to be transported to Minnesota. Essentially, McCarthy challenges the credibility of the witnesses, specifically prosecution witness Scoggins, whose testimony the district court credited over McCarthy's.

Credibility determinations are within the exclusive domain of the district court, and "are virtually unreviewable on appeal." United States v. Pugh, 25 F.3d 669, 677 (8th Cir. 1994) (internal quotations and citation omitted). The district court was entitled to credit Scoggins' testimony rather than McCarthy's in determining the extent of McCarthy's participation and the quantity of drugs that should be attributable to McCarthy. See United States v. Marks, 38 F.3d 1009, 1014 (8th Cir. 1994) (and cases cited therein), cert. denied, 115 S. Ct. 1700 (1995). Additionally, McCarthy admitted that he knew that the other conspirators were processing and drying the shipment of marijuana and that he picked up food and supplies for the other conspirators while they were processing the contraband. McCarthy's various activities certainly qualified him as an aider and abettor for the entire shipment, and under the circumstances, the actions of his coconspirators were reasonably foreseeable. Accordingly, we are not left with the firm conviction that the district court made a factual mistake with respect to its quantity calculation.

McCarthy's second challenge to his sentence concerns the district court's refusal to grant him a four-level downward adjustment to his base offense level for being a "minimal participant." USSG § 3B1.2. The district court granted a two-

level reduction, defining his role as a "minor participant."  Id.  McCarthy states in a conclusory manner that his role in the conspiracy entitles him to the four-level reduction.

As noted above, we review the district court's factual determinations concerning the defendant's role in the offense for clear error.  Flores, 73 F.3d at 835.  We consider the district court's determination of whether a two- or four-level adjustment is appropriate for an abuse of discretion. See Koon v. United States, 116 S. Ct. 2035, 2046-48 (1996).  The "minimal participant" adjustment is to "be used infrequently," such as where an individual is involved in offloading part of a single shipment or acting as a courier for a single transaction in an extensive drug conspiracy. USSG § 3B1.2, comment. (n.2); see also Fregoso, 60 F.3d at 1329.  McCarthy actively aided and abetted the marijuana manufacturing process, which took place over the course of a week at Scoggins' ranch.  McCarthy's conduct was not so limited that we can say the district court abused its discretion by granting only a two-level reduction.  We therefore conclude that the district court committed no clear error in determining the drug quantity attributable to McCarthy and did not abuse its discretion in assessing a two-level reduction for his role in the offense.

## G.

Labrie challenges various aspects of the district court's upward departure in his case.  By way of background, Labrie was a long-time friend of Scoggins and also a prominent businessman, owning a company which buys and sells satellite dishes.  Labrie loaned $30,000 to Scoggins, based on Scoggins' guarantee that Labrie would receive a return of 3:1 on his investment.  At some point in time, Labrie realized that his investment was being put toward a large-scale marijuana transaction.  Nonetheless, Labrie accepted a return on his investment totaling $90,000.  Labrie

received from Scoggins and Holmes a $50,000 investment, derived from marijuana proceeds, to start a branch office for Labrie's satellite dish company. Labrie also permitted two pickup truck loads of marijuana, totaling in excess of 1,000 pounds, to be stored in a barn on his property.

While Labrie was originally charged in the conspiracy to import and the conspiracy to distribute, Labrie was allowed to plead guilty to a one-count information, charging him with managing and controlling a building made available for the purpose of storing marijuana, in violation of 21 U.S.C. § 856. On the day before Labrie was to be sentenced, the district court sent a letter to counsel by way of facsimile that it was considering an upward departure on grounds of the gain Labrie realized on his investment with Scoggins, "as well as his abuse of his role in the community to shelter and protect his drug dealings and transactions." (Labrie Addend. at A9.) At sentencing, the district court departed upward from the Guidelines range of 15-21 months, imposing a sentence of 30 months of imprisonment.

Labrie contends for the first time on appeal that he did not receive adequate notice of the district court's intent to depart upward because the notice was untimely and the factors relied on by the district court were different from those contained in the letter provided to counsel the day before the sentencing hearing. Accordingly, we review these claims for plain error, United States v. Nomeland, 7 F.3d 744, 749 (8th Cir. 1993), giving substantial deference to the district court's decision to depart. Koon, 116 S. Ct. at 2046.

District courts must provide defendants reasonable notice that the court is sua sponte contemplating an upward departure and must identify the grounds upon which the court is contemplating departure when departing on a ground not identified as grounds for

upward departure in the presentence investigation report or in a submission by the government.  <u>Burns v. United States</u>, 501 U.S. 129, 138-39 (1991). The notice in this case was provided the day before the sentencing hearing and set forth specific grounds for an upward departure.  Labrie's counsel responded to the notice the same day.  At the sentencing hearing, the district court asked Labrie and his counsel if they had had sufficient time to consider the notice of an upward departure and told them the court was willing to provide additional time.  After conferring with counsel, however, Labrie decided to proceed with sentencing at that time, and his counsel presented arguments opposing the departure.  Labrie makes no demonstration of prejudice from the timing of the notice.  We find no error at all, and certainly no plain error.[6]

Similarly, we find no plain error with regard to Labrie's alternative argument that the district court did not give adequate notice of the specific grounds for the departure.  As noted above, he did not object at the time of sentencing.  We simply disagree with Labrie's contention that the district court relied upon grounds that were different from the grounds specified in the court's notice.  The district court informed counsel that it was considering an upward departure based on the enormous profit Labrie reaped on his investment in the enterprise and his abuse of his position in the community -- Labrie laundered drug proceeds through his legitimate business.  At sentencing, the court stated that it was imposing an upward departure because Labrie "knowingly permitted drug derived funds from his previous colleague, Mr. Scoggins, to be invested in a legitimate business, thus masking the fact that they were criminal derived proceeds."  (Labrie's Sent. Tr. at 36.)  In the course of its discussion, the court also referred to the large return Labrie obtained on his investment.

---

[6]We lament that Labrie did not inform us in his brief that he refused the district court's generous offer of a continuance of the sentencing hearing in order to meet the potential departure.

These reasons are not significantly different from those listed in the notice.  Thus, we find no plain error with respect to the notice provided by the court.

Labrie also challenges the upward departure as inappropriate. Labrie pled guilty to storing marijuana in his buildings.  <u>See</u> 21 U.S.C. § 856. The district court departed upward from the recommended Sentencing Guidelines range, stating that "the charge of storing a drug is incommensurate with the defendant's criminal acts which encompassed a vast conspiracy."  (Labrie's Sent. Tr. at 35.)  The sentencing transcript reveals that the district court also relied on Labrie's large return on his investment and his knowing use of his legitimate business to mask the drug proceeds.  Labrie claims that these factors are not the type of circumstances that warrant an upward departure.

We accord substantial deference when reviewing a district court's decision to depart from the Sentencing Guidelines.  <u>Koon</u>, 116 S. Ct. at 2046.  <u>See</u> <u>also</u> <u>United States v. McNeil</u>, 90 F.3d 298, 300 (8th Cir. 1996). "Congress allows district courts to depart from the applicable Guideline range if `the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission.'"  <u>Koon</u>, 116 at 2044 (quoting 18 U.S.C. § 3553(b)).  <u>See</u> <u>also</u> <u>United States v. Perkins</u>, 929 F.2d 436, 437 (8th Cir. 1991).  Each Guideline applies to a "heartland of typical" cases which the Commission considered in fashioning the guidelines, and atypical cases are those that warrant departure.  <u>Koon</u> 116 S. Ct. at 2044.

In <u>Koon</u>, the Supreme Court recently summarized the method by which a court should determine whether a factor considered as a basis for departure falls within or without the Guideline's heartland.  A district court must first decide whether the case

involves factors for which the Guidelines either expressly encourage departure, discourage departure, or forbid departure. Id. at 2045. Forbidden factors cannot be the basis for departure. Id. Factors for which the Commission discourages departure, or which is an encouraged factor but is already taken into account, must be "present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." Id. The Court then stated that "[i]f a factor is unmentioned in the Guidelines, the court must, after considering the `structure and theory of both relevant individual guidelines and the Guidelines taken as a whole,' decide whether it is sufficient to take the case out of the Guideline's heartland." Id. (quoting United States v. Rivera, 994 F.2d 942, 949 (1st Cir. 1993)) (internal citation omitted).

The relevant Guideline in this case is USSG § 2D1.8, "Renting or Managing a Drug Establishment." This Guideline does not take into account the acts on which the district court based its upward adjustment -- that the charge of storing marijuana was incommensurate with the defendant's criminal acts, that Labrie reaped a large return on his investment in the operation, and that he knowingly used his legitimate business to launder proceeds. These are unmentioned factors. The factors cited by the court involve Labrie's relevant conduct and are not used anywhere in his Guidelines calculation to determine his offense level. Activities of investing in a drug activity and laundering the proceeds through a business or charitable donation (as was present in this record) are beyond what is required to fall within the conduct addressed by this Guideline. Accordingly, we conclude that the district court did not abuse its discretion in deciding to depart upward because this case falls outside the heartland of cases normally arising under the Guideline for using buildings to store marijuana. Furthermore, we conclude that the extent of the departure in this

case (nine months) was not unreasonable and that the district court did not abuse its discretion.

## III.

For the reasons stated above, we affirm the judgments of the district court in each of these appeals.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.